In re Thomas M. BANKS, Debtor.

GILL DISTRIBUTION CENTERS, INC., Plaintiff,

v.

Thomas M. BANKS, Defendant.

GILL DISTRIBUTION CENTERS, INC., Plaintiff,

v.

PORT WAREHOUSE CORPORATION, a Corporation; Transworld Distribution Services, Inc., dba Richardson Warehouse Company, a Corporation; Pirelli Tire Corporation, a Corporation; Ronald Richardson, an individual; Thomas Banks, an individual, Defendants.

Ronald RICHARDSON and Transworld Distribution Services, Inc., Plaintiff,

v.

Thomas M. BANKS, Defendant.

Bankruptcy No. SV 96–14251–GM.

Adv. Nos. 96–01416–GM, 96–01515–GM, 96–01334–GM.

United States Bankruptcy Court, C.D. California.

Oct. 7, 1998.

---

Robert Hunter, Los Angeles, CA, for Debtor.

Phillip K. Fife, Seal Beach, CA, for Creditor.

E.T. O'Farrell, Riverside, CA, for Creditor.

## AMENDED MEMORANDUM OF OPINION

GERALDINE MUND, Bankruptcy Judge.

### INTRODUCTION

The issues before the Court are twofold. First, is a bankruptcy court bound by the applicable state statute of limitations or by Federal Rule of Bankruptcy Procedure 4007 (hereinafter "F.R.B.P. 4007") when determining the timeliness of a complaint to declare a debt non-dischargeable? Second, did Debtor's conduct constitute grounds for non-dischargeability of debt · pursuant to §§ 523(a)(2), (a)(4) or (a)(6), the last of these sections being analyzed under the recently-published standard in *Kawaauhau v. Geiger*,

—— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)?

## FACTS

All actions in this case stem from several leases and subleases involving Gill Distribution Centers, Inc. ("Gill"), Pirelli Tire Corporation ("Pirelli"), Ronald Richardson ("Richardson"), Port Warehouse Corporation ("Port"), Transworld Distribution Services, Inc., aka Richardson Warehouse Company ("Transworld"), and Thomas Banks ("Banks"). The Court has found that Richardson, Port and Transworld were and are one entity (referred to herein as "Richardson" or the "Richardson Parties").

On January 31, 1983, in preparation for litigation against Pirelli, Banks and Richardson entered into a retainer agreement whereby Banks (an attorney) would represent Transworld, a corporation owned solely by Richardson. This was a contingency contract, under which Banks' fee would be 33 1/3% of all money received by compromise or settlement, or 40% of all money received by way of judgment or of settlement within thirty (30) days prior to any settlement conference date.[1]

On October 21, 1983, Gill filed a complaint in the Los Angeles County Superior Court against various parties including Richardson, Transworld, Banks, and Pirelli. Richardson filed a cross-complaint against Banks. Shortly before the consolidation of Gill's action against Pirelli with Richardson's action against Pirelli, Gill entered into a Settlement Agreement with, among others, Banks and Richardson. Banks signed the Settlement Agreement on behalf of himself and as the attorney for Transworld. Richardson signed the Settlement Agreement on behalf of himself and as the president of Transworld.

Per the terms of the Settlement Agreement dated February 20, 1998, Richardson assigned to Gill forty percent (40%) of any recovery it might obtain from Defendant Pirelli up to, but not to exceed, $135,000. The Settlement Agreement further provided that, in the event Richardson obtained a judgment against Pirelli, Gill was entitled to receive any interest that had accrued on Gill's portion of the judgment during an appeal.

On April 17, 1991, a state-court judgment against Pirelli was affirmed on appeal, and Pirelli paid $572,247.33 to a trust account in Banks' name, representing both the amount that was received before the attorney's fees on appeal ($522,871.33) and the attorney's fees on appeal ($49,375.60). Per the Settlement Agreement, Gill was entitled to receive $170,648.13 (the capped principal of $135,000 plus interest thereon through April 17, 1991); the remaining $401,599.20 was to be split between Richardson and Banks pursuant to the existing fee agreement. However, Banks never paid Gill its share of the award. Instead, Banks distributed $261,435.86 to Richardson (which was $20,476.35 more than his entitlement per the Settlement Agreement) and Banks kept the remaining $310,811.47 for himself ($150,171.78 more than his share).

It was Banks' intention either to negotiate a settlement with Gill, in which Gill would accept substantially less than its entitlement of $170,648.33, or to delay Gill long enough for the statute of limitations to expire, and thus preclude Gill from pursuing legal recourse to recover its deserving share.[2] Although Banks knew that Richardson might be sued and be found liable to Gill for the entire amount under the Settlement Agreement, Banks never intended to transfer any of the proceeds to Gill.

On April 14, 1995, Gill filed a contract action in state court against Richardson,

---

1. Exhibit I, Declaration of Thomas Banks in Support of Motion for Summary Judgment against Plaintiffs Ronald Richardson and Transworld Distributions Services, Inc., Adv. No. 96–01334–GM. This pleading is part of the consolidated adversary proceeding presently before the Court, and is cited as the location of the fee agreement for the sole reason that the retainer agreement is not contained as an Exhibit to any other pleading before the Court.

While an issue surfaced at the dischargeability trial regarding the percent owed Banks under the Banks/Richardson fee agreement, the Court found that Banks was entitled to forty percent (40%) of the gross recovery. Transcript of Dischargeability Trial at 193.

2. Specific Findings of Fact were made on the record during the trial and are the basis for the broader factual statements in this Memorandum of Opinion.

Transworld, Port, Banks and Pirelli, seeking damages for their alleged failure to comply with the Settlement Agreement. As the statute of limitations for contract actions in California is 4 years, Cal.Code Civ.Proc. § 337 (1998), Gill's state-court action was timely filed. Approximately one year later, on April 18, 1996, prior to resolution of the state-court case, Banks filed a voluntary petition under chapter 7 of the Bankruptcy Code. Immediately thereafter, Gill and Richardson filed separate complaints against Banks to determine dischargeability of debt alleging fraud, breach of fiduciary duty, and willful and malicious injury.[3] Because Gill failed to include fraud as an allegation in its state-court complaint, Debtor argued at the dischargeability trial that Gill was precluded from obtaining a fraud determination in this Court due to the pre-petition expiration of California's statute of limitations for fraud actions.[4]

## DISCUSSION

### State Statute of Limitations vs. F.R.B.P. 4007

Within the last year, two Circuit Courts of Appeals have addressed the procedural issue of whether the applicable state statute of limitations or that provided in F.R.B.P. 4007 governs the timeliness of complaints to determine dischargeability of debt. While those decisions differ slightly in regards to the factual scenario with which the Court is now presented, their holdings and rationale are integral to the resolution of this matter.

The Ninth Circuit dealt with this question in *Lee–Benner v. Gergely (In re Gergely)*, 110 F.3d 1448 (9th Cir.1997), in which a

medical malpractice action had been filed by a mother on behalf of her six-year old daughter against Dr. Robert Gergely; the suit alleged wrongdoing in conjunction with the child's birth. The plaintiff filed the state-court lawsuit for the tort action just days before the expiration of California's six-year statute of limitations for tort actions. *Lee–Benner v. Gergely (In re Gergely)*, 186 B.R. 951 (9th Cir. BAP 1995).[5] The complaint did not allege fraud, and judgment was rendered in the plaintiff's favor. After the verdict, it was discovered that Dr. Gergely's medical malpractice insurance carrier was insolvent, and four years after the filing of the malpractice claim (and nearly ten years after the alleged malpractice was committed), Dr. Gergely filed for bankruptcy, listing the plaintiff as an unsecured creditor. *Id.* at 954. The plaintiff then filed a complaint to determine dischargeability of debt, alleging fraud, breach of fiduciary duty and willful and malicious injury. *Id.* The debtor answered with an assertion that the debt should not be deemed non-dischargeable on the grounds that, on the date of the bankruptcy filing, the debt was dischargeable because any allegation of fraud would have been barred by California's three-year statute of limitations for fraud actions. *Id.* Therefore, the debtor sought dismissal of the adversary case.

The bankruptcy court ruled that a dischargeability action brought under § 523(a), where the state statute of limitations for fraud actions expired prior to the bankruptcy filing, was subject to dismissal because it was based on an unenforceable claim. *Id.* at 955. The Bankruptcy Judge reasoned that, since the statute of limitations ran pre-petition on fraud, which would have been the only cause

---

**3.** Gill and Richardson each pled non-dischargeability pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6) respectively. *Gill v. Banks* is Adv. No. 96–01416–GM; *Richardson/Transworld v. Banks* is Adv. No. 96–01334–GM. On August 13, 1996, Gill removed the state-court lawsuit to this Court as Adv. No. 96–01515–GM. Because Adv. No. 96–01515–GM and Adv. No. 96–01416–GM contained substantial the same issues of law and fact, the Court entered an order consolidating these two adversary proceedings on December 20, 1996.

**4.** As to Gill's first claim for nondischargeability, fraud, any cause of action would have been un-

timely at the time of filing due to California's three-year statute of limitations for fraud actions. Cal.Code Civ.Proc. § 338(d) (1998). As to Gill's assertions of breach of fiduciary duty and willful and malicious injury, California's four-year catchall statute of limitations applies and any claim Gill had also would have been precluded on the petition date. Cal.Code Civ.Proc. § 343 (1998).

**5.** Of the published decisions in this case, the most detailed factual account is contained in that of the Bankruptcy Appellate Panel of the Ninth Circuit.

of action that could have resulted in a nondischargeable judgment, "it would be inequitable to 'revive' ... that cause of action inside bankruptcy." *Id.* The Bankruptcy Appellate Panel affirmed, and the Ninth Circuit reversed in part that portion of the decision holding that the state statute of limitations trumps F.R.B.P. 4007. *Gergely,* 110 F.3d at 1453.

The Ninth Circuit concluded that "the expiration of a state statute of limitations does not affect an action for nondischargeability *if there is a valid judgment." Id.* (emphasis added). The Ninth Circuit's reasoning was cursory: "[The creditor] is not seeking a new money judgment based on fraud; he is litigating the issue of dischargeability ... and the timeliness of the petition is governed by the Bankruptcy rules." *Id.* The Court continued by stating that it was adhering to a recent Tenth Circuit decision which held that "the question of the dischargeability of the debt under the Bankruptcy Code is a distinct issue governed solely by the limitations periods established by bankruptcy law." *Id., citing Resolution Trust Corporation v. McKendry (In re McKendry),* 40 F.3d 331, 337 (10th Cir.1994).

While the Ninth Circuit was brief in its rationale for applying F.R.B.P. 4007, the Tenth Circuit examined the issue in greater detail. In *McKendry,* the posture of the case was virtually identical to *Gergely:* a deficiency judgment was entered in state court on a complaint which did not allege fraud, a bankruptcy was filed soon thereafter, and the state statute of limitations for fraud actions expired pre-petition. *Id.* at 332–33. As stated by the Tenth Circuit: "the question in this case is, *where a debt has been reduced to judgment in state court,* can the bankruptcy court be ·barred by a state statute of limitations from considering the underlying nature of the debt in determining whether that debt is dischargeable." *Id.* at 334 (emphasis added). The court answered that question in the negative, finding that two separate and distinct issues arise when analyzing dischargeability of a debt: first, the establishment of the debt itself, which is subject to the applicable state statute of limitations; and, second, a determination as to the nature of that

debt, an issue within the exclusive jurisdiction of the bankruptcy court and thus governed by F.R.B.P. 4007. *Id.* at 337.

While both *McKendry* and *Gergely* seem to hold that a pre-petition state-court judgment is required in order to establish a debt prior the bankruptcy filing, the *McKendry* court, in dicta, intimated that the mere filing of a lawsuit in state court would be sufficient to remove the timing issue from the governance of the state statute of limitations. *McKendry,* 40 F.3d at 337. This distinction is crucial to resolving the dispute presently before this Court.

While numerous bankruptcy courts have addressed the issue of the applicable period governing the timeliness of a complaint to determine dischargeability of debt, no decision has emerged on point since the issuance of *Gergely.* Furthermore, no bankruptcy court has faced the precise factual scenario which this Court currently confronts—that is, whether a debt can be established prior to bankruptcy without obtaining a state-court judgment. Accordingly, while obliged to adhere to the law of this Circuit, the Court chooses to extend the reach of *Gergely* in a manner not inconsistent with the policies underlying the Bankruptcy Code, and in accordance with the approach employed by both the Ninth and Tenth Circuits in their respective decisions.

■ The Court agrees with the proposition enunciated in *McKendry* and adopted by *Gergely* that a determination of dischargeability is a two-step process. This categorization was well stated by the *McKendry* Court, when it found a distinction between an action brought under state law to enforce state-created rights and an action filed within the confines of a bankruptcy case to a determine the dischargeability of a debt under § 523:

... [there are] two distinct issues in a nondischargeability proceeding. The first, the establishment of the debt itself, is governed by the state statute of limitations—if suit is not brought within the time period allotted under state law, the debt cannot be established. However, the question of the dischargeability of the debt under the Bankruptcy Code is a distinct issue gov-

erned solely by the limitations periods established by bankruptcy law.

*McKendry*, 40 F.3d at 337.[6]

■ The first prong of this analysis, the establishment of a debt, is critical because satisfying this element provides the creditor with the access key to an adjudication of dischargeability of that debt. Section 101 of the Bankruptcy Code defines the term "debt" to mean "liability on a claim," 11 U.S.C. § 101(12), and "claim" is defined as a "right to payment, whether or not such right is reduced to judgment...." 11 U.S.C. § 101(5). Thus, a debt does not require a pre-petition state-court judgment to exist in bankruptcy court. The only issue is whether the underlying policy of the Bankruptcy Code is met by requiring that the debt be firmly and completely established through judgment in the state court, whether it is sufficient for the creditor to begin the process of collection, or whether the creditor is relieved of any responsibility to enforce its claim pre-petition.

The holdings of *McKendry* and *Gergely* moot the third possibility. However, it would be arbitrary at best to hold that a debt can only be established if the plaintiff obtained a judgment from the state court prior to the filing of the bankruptcy case.

■ *Therefore this Court holds that a debt upon which the state statute of limitations for fraud, breach of fiduciary duty, etc. has run prior to the filing of the bankruptcy case has been "established" prepetition if the creditor has taken a timely affirmative act which is necessary to the creditor's ability to collect the debt in a manner provided for by law.* To find otherwise, the court would risk holding the creditor hostage to the debtor's choice of timing as to the filing of the bankruptcy petition. In other words, if the debtor files bankruptcy the day after a state-court judgment is rendered, the creditor would have an opportunity to prove the debt nondischargeable; however, if the debtor files bankruptcy the day before judgment is entered, the creditor

would be foreclosed from such judicial action and the debt would be discharged. Such an interpretation of the law would divert the focus away from the creditor's initiative to enforce a claim against the debtor, and instead would place the creditor's judicial fate in the hands of the debtor, or the debtor's attorney, by deeming dispositive the date of the bankruptcy filing. The establishment of a debt prior to bankruptcy should be a tangible hurdle the creditor must overcome, not a looming inevitability the debtor is able to avoid by strategically timing the petition date.

An argument frequently raised by debtors who find themselves in the precarious position of facing a § 523(a) action when the state statute of limitations for the applicable § 523 theory of liability expired pre-petition is that the creditor should not be entitled to assert a claim inside bankruptcy when it would be precluded from doing so outside the bankruptcy context. However, such a rationale would have the onerous effect of placing an overwhelming burden on state-court litigants to plead all plausible causes of action in anticipation of a possible bankruptcy filing as part of their strategy in preparing their state-court case. In *Spinnenweber v. Moran (In re Moran)*, 152 B.R. 493, 496 (Bankr. S.D.Ohio 1993), the bankruptcy court echoed this policy-based sentiment:

... there is no requirement that the allegations of a complaint filed in state court prior to a debtor filing a petition in bankruptcy correspond to the elements of the grounds contained in § 523(a) of the Bankruptcy Code. Otherwise, plaintiffs in state court would be required to anticipate the bankruptcy of every defendant and litigate every conceivable issue under § 523(a) in the event a defendant should subsequently file bankruptcy. Such needless litigation is not required by the Bankruptcy Code.

■ Furthermore, the long line of cases following the Supreme Court's decision in *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), supports this reason-

---

**6.** This quote seems to indicate that the mere filing of the lawsuit within the applicable state statute of limitations is sufficient. However, this is dicta as the specific holding of *McKendry* is restricted to where the debt has been reduced to judgment in state court. *McKendry*, 40 F.3d at 337.

ing. While on a slightly different aspect of § 523 litigation, *Brown* evidences an established approach to preserving bankruptcy courts' exclusive jurisdiction in areas delegated to them by Congress. Decided under § 17 of the Bankruptcy Act of 1938, the predecessor to § 523, the *Brown* court found that application of res judicata to bar the filing of a dischargeability proceeding because the creditor had failed to plead fraud in its state-court case would inspire needless litigation by forcing "an otherwise unwilling party to try § 17 questions to the hilt in order to protect himself against the mere possibility that a debtor might take bankruptcy in the future." *Id.* at 135, 99 S.Ct. at 2211. Therefore, public policy supports the position that the pre-petition expiration of the applicable state statute'of limitations for the cause of action predicated on the § 523(a) theory of liability should not presumptively preclude the creditor from pursuing a dischargeability action on that ground in the bankruptcy case.

At this point, after determining that the debt was successfully established pre-petition, the state statute of limitations becomes immaterial, as dischargeability issues are within the purview of the bankruptcy court's exclusive jurisdiction and issues relating thereto are to be decided within the confines of the bankruptcy court as provided by Congress.

This conclusion is supported by the language and structure of Bankruptcy Rule 4007. Rule 4007(b) provides that complaints for nondischargeability other than those filed under § 523(c) may be filed at any time. By contrast, subsection (c) imposes a sixty-day deadline for filing complaints to determine the dischargeability of debts under § 523(c), i.e. complaints alleging nondischargeability under § 523(a)(2), (4) and (6). If claims of nondischargeability under § 523(c) are not brought within the sixty-day period, the debts are discharged.... It would make little sense to impose a sixty-day filing period for claims of nondischargeability under Rule 4007(c) only to have the question of the timeliness of the claim determined by a state statute of limitations. We do not believe such was the intent of Congress.

*McKendry,* 40 F.3d at 336.

■ As applied to the facts of the instant case, the Court concludes that Gill's filing of a lawsuit in state court and Richardson's filing of a cross-complaint were each sufficient to establish a debt since both constituted affirmative acts which obviously were necessary to and in furtherance of Gill's and Richardson's respective attempts to collect upon their debts in a manner provided for by law.[7] And because the adversary complaints were timely filed under F.R.B.P. 4007, it is within this Court's exclusive jurisdiction to determine the nature of those debts and, ultimately, whether the debts are dischargeable under § 523(a).

■ Counsel for the Debtor further argued that, in this case, Gill filed a lawsuit in state court which it had no chance of winning, and, due to the futile nature of the state-court action, Gill did not take a timely affirmative act against Banks which was necessary to its ability to collect the debt in a manner provided for by law. The Court disagrees with this logic. As long as the initial state-court lawsuit was filed in good

---

7. This issue poses questions with regard to other factual scenarios. For example, arguments may be raised over whether the filing of a Notice of Default with the County Recorder's office in relation to a defaulted mortgage constitutes a timely affirmative act which is necessary for a creditor to collect the debt in a manner provided for by law. Also, what result when a party anticipitorily repudiates a contract and chooses the remedy of suspending his or her own performance while awaiting the other party's performance prior to bringing a lawsuit—is the suspension of performance sufficient to establish a debt should the debtor file for bankruptcy prior to the expected date of his or her performance? These and other narrow fact patterns are very real, and may provide for interesting litigation in bankruptcy courts. Nonetheless, this Court is limited in its holding to the facts of the instant case. However, in resolving these and other similar issues, *see* Alan M. Ahart and Stacy M. Hopkins, *The Role of Nonbankruptcy Law in Dischargeability Proceedings; Unenforceable Obligations Must Not Survive Discharge While Enforceable Obligations May Be Excepted from Discharge,* Journal of Bankruptcy Law and Practice, vol. 7, No. 2, 161 (1998), for a slightly different approach to analyzing the effect of applicable nonbankruptcy statutes of limitations on dischargeability proceedings which may or may not lead to a different result.

faith, and the arguments and allegations contained therein were based on a good-faith interpretation of existing law or good-faith efforts to change the law, the lawsuit is not frivolous and is sufficient to establish a debt prior to bankruptcy. Gill's filing of a state-court contract action pre-petition and Richardson's filing of a cross-complaint against Banks prior to bankruptcy each established a debt and allow the Court to determine the nature of the respective debts in the context of dischargeability litigation.

## The Complaints

### (1) Gill's Complaint Against Banks

■ At trial, the Court determined that Gill could not successfully seek nondischargeability based on fraud pursuant to § 523(a)(2) due to its failure to establish the requisite elements of reasonable reliance and damages resulting from Bank's conduct in the state-court case and alleged failure to comply with the Settlement Agreement.[8] The Court also found that Gill could not succeed on a dischargeability claim pursuant to § 523(a)(4), breach of fiduciary duty, because of a lack of fiduciary relationship between Banks and Gill. Finally, the Court found that Gill did have a viable claim for nondischargeability pursuant to § 523(a)(6) for willful and malicious injury under the Ninth Circuit standard in *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440 (9th Cir.1986).

While this matter was under submission to deal with the statute of limitations issue, the Supreme Court published *Kawaauhau v. Geiger*, —— U.S. ——, ——, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998), wherein it clarified the standard to be employed when determining whether a party's conduct has risen to the level of "willful and malicious injury," and effectively overruled the *Cecchini* standard. Due to this recent change in the law and the fact that this Court made its initial finding under the now-antiquated standard,

the Court must reevaluate its previous ruling on § 523(a)(6) under the new standard.

The issue in *Geiger* was whether a debt arising from a medical malpractice judgment, attributable to negligent or reckless conduct, was nondischargeable pursuant to § 523(a)(6). *Id.*, —— U.S. at ——, 118 S.Ct. at 975. The Court held the debt was dischargeable. *Id.* The Petitioners argued that the malpractice award fell within the dischargeability exception because "Dr. Geiger intentionally rendered inadequate medical care to Margaret Kawaauhau that necessarily led to her injury." *Id.*, —— U.S. at ——, 118 S.Ct. at 976. This argument sparked the Court's query: "Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury (as the Kawaauhaus urge), or only acts done with the actual intent to cause injury?" *Id.* at ——, 118 S.Ct. at 977. The Court held that the word "willful" modifies the word "injury," and therefore nondischargeability requires a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* Thus, as applied to the case at bar, in order for this Court to deem Bank's debt to Gill nondischargeable under § 523(a)(6), Bank's conduct must have been committed with the intent to injure Gill.

Under *Geiger*, Banks' conduct with respect to Gill amounts to a "wilful and malicious injury." Banks intended to injure Gill by forcing Gill to take substantially less than it was owed under the Settlement Agreement, or perhaps nothing at all. Further, the act was wrongful and Banks knew that it was wrongful. Banks had no justification for withholding the money from Gill, nor for his attempts to delay Gill in its inquiry into what had happened to the money. Thus, Gill is entitled to judgment against Banks on its non-dischargeability claim under § 523(a)(6).

### (2) Gill's Complaint Against Richardson, et. al.

■ Under the Settlement Agreement, Gill dismissed claims against Transworld and

---

8. To find fraud under § 523(a)(2)(A), a creditor must successfully demonstrate five elements: (1) The debtor must have made a representation; (2) at the time the representation was made the debtor must have known it was false; (3) it must have been made with the intention and purpose

of deceiving the creditor; (4) the creditor must have relied on the representation; and (5) the creditor must have sustained damage because of that as a proximate cause. *Lee-Benner v. Gergely (In re Gergely)*, 110 F.3d 1448, 1453 (9th Cir. 1997).

Banks, among others, in consideration for certain payments and assignments. Specifically, Richardson assigned to Gill 40% of any judgment Richardson might obtain from Pirelli. The Settlement Agreement represented a valid contract.

A breach occurs when a party to a contract deliberately refuses to do that which he has agreed to do under the contract. *See* 1 Witkin, Summary of Cal.Law (9th ed. 1997) *Contracts* § 791. Richardson, as a party to the contract, has not tendered performance because he has failed to ensure payment to Gill of its $170,648.13 share of the award. Instead, Banks, Richardson's attorney, intentionally retained $150,171.78 in excess of his entitlement for himself, and allocated to Richardson $20,476.45 more than his share. Although Richardson knew that this amount belongs to Gill, he has failed to transfer the proceeds in accordance with the Settlement Agreement. As a result of this breach, Gill is entitled to the amount of $20,476.45 which Banks misappropriated to Richardson, plus interest.

■■■■ Richardson also is liable for the $150,171.78 Banks retained in excess of his entitlement. As Richardson's attorney, Banks deposited the funds received from Pirelli into a client-trust account, and he failed to transfer the appropriate amount to Gill. If an attorney acts within the scope of his or her authority, expressed or implied, the client is bound by the attorney's action. *Gudger v. Manton,* 21 Cal.2d 537, 134 P.2d 217 (1943) (overruled on other grounds by *Albertson v. Raboff,* 46 Cal.2d 375, 295 P.2d 405 (1956)); *Yanchor v. Kagan,* 22 Cal. App.3d 544, 99 Cal.Rptr. 367 (1971). Moreover, a client ratifies the acts of his or her attorney if the client fails to object upon receipt of all relevant facts.[9] Under the rules of ratification, the client is estopped to contest the binding effect of the attorney's actions, including unauthorized actions. *Stockwell v. McAlvay,* 10 Cal.2d 368, 74 P.2d 504 (1937), *cert. denied and app. dismissed,*

304 U.S. 547, 58 S.Ct. 1047, 82 L.Ed. 1520 (1938).

Richardson knew that he had received $20,476.45 more than his share and that Banks intended to induce Gill into settling for substantially less. Although Richardson may not have known all the details of Banks' transactions with Gill, he did know that Banks did not intend to transfer to Gill the amount Gill was entitled to under the Settlement Agreement. Thus, if Banks were not acting under express authority, which he may have been, Banks did have implied authority. Furthermore, at the very least, Richardson ratified Banks' actions by failing to object. Therefore, Richardson is liable for the entire $170,648.33 due Gill under the Settlement Agreement, plus interest.

■■■■ In addition, Richardson is liable for the entire $170,648.33 because of his breach of California's covenant of good faith and fair dealing. California law recognizes an implied covenant of good faith and fair dealing in a contract that neither party will do anything to deprive another party of the benefit of the bargain. *Cancellier v. Federated Dept. Stores,* 672 F.2d 1312 (9th Cir. 1982). Breach of this covenant gives rise to either a contract action or a tort claim with tort measures of compensatory damages and the right to recover punitive damages. *See* 1 Witkin, Summary of Cal.Law (9th ed. 1997) *Contracts* § 743. Richardson knowingly accepted more than his share; he also knew or should have known of Banks' scheme to keep, in bad faith, the remainder of the funds for himself. Thus, Richardson also is liable due to his breach of the covenant of good faith and fair dealing.

*(3) Richardson's Complaint Against Banks*

The Richardson Parties filed a complaint to determine dischargeability of debt against Banks for protection against a potential judgment in the state-court contract action brought by Gill against Richardson for breach of the Settlement Agreement.

---

9. *See Porter v. Elizalde,* 125 Cal. 204, 57 P. 899 (1899); *Title Ins. & Trust Co. v. California Development Co.,* 168 Cal. 397, 143 P. 723 (1914); *Henshall v. Coburn,* 177 Cal. 50, 169 P. 1014 (1917); *Blanton v. Womancare, Inc.,* 38 Cal.3d 396, 212 Cal.Rptr. 151, 696 P.2d 645 (1985); *Moving Picture Machine Operators Union v. Glasgow Theaters, Inc.,* 6 Cal.App.3d 395, 86 Cal. Rptr. 33 (1970).

Richardson, in his complaint against Banks, pled non-dischargeability under §§ 523(a)(2), (a)(4) and (a)(6). The Court finds that Richardson cannot successfully pursue his claim under § 523(a)(2) as Banks did not *obtain* the money by fraud on Richardson. As for § 523(a)(6), per *Geiger*, the Court finds that Banks did not intend to injure Richardson/Transworld. In fact, Richardson received $20,476.35 more than he was entitled to. While Banks' action resulted in Richardson being liable for damages to Gill, such was not Banks' intent. Banks did not intend to injure Richardson, he intended to injure Gill to his own benefit. Therefore, Richardson cannot succeed on his § 523(a)(6) claim.

However, Richardson is entitled to judgment for breach of fiduciary duty under § 523(a)(4). Banks, as Richardson's attorney, owed Richardson a fiduciary duty. The relationship between attorney and client is, by its nature, a fiduciary relationship, and a duty of loyalty precludes an attorney from receiving personal gains to the client's detriment. *See Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 98 Cal. Rptr. 837, 491 P.2d 421 (1971).

Whether an attorney has breached a fiduciary duty is a question of fact. *Stanley v. Richmond,* 35 Cal.App.4th 1070, 41 Cal. Rptr.2d 768 (1995). The Court finds that Banks, in bad faith, attempted either to induce Gill into accepting substantially less than its share of the award, or to delay Gill long enough so as to preclude it from judicial action. In doing so, Banks knew that his client might be liable to Gill for any damages Gill suffered. Thus, Banks breached his fiduciary duty of loyalty to his client. According to established California law, "[r]ecovery for damages based upon breach of fiduciary duty is controlled by Civil Code § 3333, the traditional tort recovery." *Id.* at 1082, *citing Stokes v. Henson,* 217 Cal.App.3d 187, 197–198, 265 Cal.Rptr. 836 (1990). Section 3333 provides:

> For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proxi-

mately caused thereby, whether it could have been anticipated or not.

West's Ann.Cal.Civ.Code § 3333 (1998).

Because of Banks' breach of his fiduciary duty to his client Richardson, judgment will be entered against Banks and in favor of Richardson in the amount of $150,-171.78 as indemnity for any amount collected from Richardson by Gill in excess of the $20,476.45 for which Richardson is severally liable. The California Supreme Court has defined indemnity as "the obligation resting on one party to make good a loss or damage another party has incurred." *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97 (1975). The obligation to indemnify "may be expressly provided for by contract ..., may be implied from a contract not expressly mentioning indemnity ..., or it may arise from the equities of the particular circumstances." *Id.* (citations omitted).

The remedy of equitable indemnification in favor of Richardson and against Banks is the fair result of Banks' liability to Richardson for breach of fiduciary duty. "[Equitable indemnification] applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party." *Phoenix Insurance Co. v. United States Fire Insurance Co.,* 189 Cal.App.3d 1511, 235 Cal.Rptr. 185 (1987), *citing Aetna Life & Cas. Co. v. Ford Motor Co.,* 50 Cal.App.3d 49, 52–53, 122 Cal. Rptr. 852 (1975).

In the case at bar, if and when Richardson pays any amount to Gill in excess of the $20,476.45 for which he is severally liable, he would by paying a debt for which Banks is primarily liable and which in good conscience should have been paid by Banks because Banks is, and always has been, in possession of the funds that should have been allocated to Gill. However, Richardson will not suffer a loss unless and until he pays Gill more than $20,476.45. At that time, Richardson can recover from Banks the additional amounts paid.

### *Interest*

Under California law, Gill is entitled to pre-judgment interest on its claim against Banks and against Richardson[10]. The removed case (Gill v. Richardson, *et al.*) is equivalent to a diversity action, as it is not brought under any aspect of federal law and is in this court only due to its relationship to the Banks' bankruptcy. In diversity cases, state law governs the award of pre-judgment interest. *Unies v. Kroll & Linstrom,* 957 F.2d 707, 714 (9th Cir.1992). Under California law, pre-judgment interest accrues at the rate of 10 percent per annum. Gill's action against Richardson is a contract action, and pursuant to § 3289(b) of the California Civil Code, in the absence of a specific provision in the contract, the applicable interest rate is 10% for all contracts entered into after January 1, 1986, Cal.Civ.Code § 3289(b) (1998). As the settlement agreement was dated February 20, 1998, the judgment in favor of Gill against Richardson is in the amount of $170,648.13 plus interest at 10% from April 17, 1991 (the day that Banks deposited the Pirelli check in his trust account) until entry of judgment.

The judgments of Gill against Banks and of Richardson against Banks are both on federal, not state, claims for relief. Interest on a federal judgment is determined by 28 U.S.C. § 1961, which provides that interest on a civil judgment recovered in a district court is calculated from the date of entry of the judgment at a rate equal to the coupon issue yield equivalent of the average accepted auction price for the last auction of 52–week United States Treasury bills settled immediately prior to the date of the judgment. While this does not refer to pre-judgment interest, the Ninth Circuit has determined that pre-judgment interest also is at the Treasury bill rate unless the equities demand otherwise. *Blanton v. Anzalone,* 813 F.2d 1574 (9th Cir.1987). Although *Blanton* does not specify the date to be used in choosing the Treasury bill rate, presumably it is the date of entry of judgment rather than the date from which the damages could be calculated.

Under *Blanton,* there can be tremendous flexibility in determining interest so long as the judge enunciates the reason for setting a certain rate. In the instant case, there is reason to deviate from the traditional federal interest rate. The federal interest rate at the time of preparing this opinion is 5.413% as compared to the California interest rate of 10%. To apply the federal rate to the judgments against Banks, but the state rate to the judgment against Richardson would lead to incompatible and unfair amounts of recovery in this case. It is necessary to have the same post-judgment interest rate used in each of the three judgments or Gill would be entitled to recover more from Richardson than it could recover directly from Banks and Richardson would not be able to seek full indemnification from Banks for the amount that he pays Gill. Accordingly, California's 10% pre-judgment interest rate will be applied to all judgments in this proceeding.

However, once the judgment is entered, the federal interest rate applies to all three cases, as even judgment in a diversity case accrues post-judgment interest at the federal, rather than the state, rate. *Mobil Exploration & Producing North America, Inc. v. Graham Royalty Ltd.,* 910 F.2d 504 (8th Cir.1990).

Judgment will be entered in accordance with this opinion.

---

10. West's Ann.Cal.Civ.Code § 3287(a) (1988) provides: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevent by law, or by the act of the creditor from paying the debt."